*In re* ESTATE OF JENNY JOUTSEN.—(J. STERLING MORTIMER, Guardian of the Estate of Jenny Joutsen, Petitioner-Appellee, *v.* LAWRENCE WOODFIELD *et al.*, Respondents-Appellants.)

First District (5th Division)    Nos. 80-0135, 80-1151 cons.

Opinion filed September 4, 1981.

Beermann, Swerdlove, Woloshin, Barezky & Berkson, of Chicago (Miles N. Beermann and Howard A. London, of counsel), for appellants.

Patrick T. Murphy, Karin H. Swanson, and Robert A. Merrick, Jr., all of Chicago, for appellee.

Mr. JUSTICE WILSON delivered the opinion of the court:

Following a bench trial, respondents, Lawrence Woodfield and Donna Bagnuolo (now married), were ordered to pay the sum of $90,027.26 to the guardian of the estate of Jenny Joutsen, petitioner-appellee. On appeal, they contend that (1) the court did not have the authority to order them to repay $90,027.26 to the estate; (2) the court's finding of Jenny Joutsen's incompetency is against the manifest weight of the evidence; and (3) the court's finding that respondents received $90,027.26 from Jenny Joutsen is against the manifest weight of the evidence. A separate appeal to be considered with this case involves a supplementary citation to discover and recover assets brought to recover alleged assets of the estate transferred to a third party. The court ruled that no prima facie case was established, and petitioner appeals. The pertinent facts follow.

On May 11, 1978, the trial court entered an order appointing J. Sterling Mortimer as guardian ad litem for Jenny. Following his report, the court adjudged Jenny an incompetent. The guardian filed a petition on October 18, 1979, for discovery and recovery (Ill. Rev. Stat. 1977, ch. 110½, pars. 16—1, 16—2) against respondents alleging that on November 28, 1977, Jenny's estate included $74,000 in four savings accounts and four $5,000 United States savings bonds. He further alleged that respondents had obtained possession of these monies and other personal property and had converted or embezzled this property by compelling Jenny to sign papers which she did not and could not understand as a result of her impaired mental capacity. The petition requested the return of all personal property belonging to the estate and the voiding of any documents purporting to transfer funds from Jenny to respondents.

Jenny resided with her husband, Timo, at 6211 West Fullerton until his death on November 28, 1977. On December 3, 1977, Jenny executed a power of attorney to Bagnuolo, which was prepared and witnessed by Samuel Del Principe, an attorney. He indicated that at Bagnuolo's request, he visited Jenny at her home initially on December 1, 1977. Del Principe also prepared a State inheritance tax return, Federal estate tax return and a will on Jenny's behalf. The will, also executed on December 3, 1977, and witnessed by Woodfield, provided that Bagnuolo would inherit all of Jenny's property upon her death. Del Principe testified that before he executed the power of attorney he determined that Jenny was mentally competent. He also explained each paragraph to her before she signed it, and Jenny confirmed that she wanted Bagnuolo to act on her behalf.

Bank records indicated that on November 28, 1977, Jenny had

approximately $75,728.74 in four bank accounts and $20,000 in United States savings bonds in $5,000 denominations. These bank funds were collected and deposited into two joint accounts at the Midwest Bank & Trust Company in the names of Jenny Joutsen and Donna Bagnuolo. Bagnuolo secured access to the Joutsen safety deposit box which contained the savings bonds on March 17, 1978. The bonds were redeemed and the proceeds were deposited into the joint checking account of Jenny and Bagnuolo at the Bank. Bagnuolo withdrew $72,302.83 from the joint account and loaned the money to Woodfield, who in turn loaned the money to Woodfield Industries. Other funds were then withdrawn from these joint accounts and placed in the joint accounts of Woodfield and Bagnuolo. The loan was executed three weeks after guardianship proceedings had been instituted.

Mortimer testified that when he visited Jenny in her home on May 28, 1978, he found Jenny to be totally disoriented even initially as to her own identity. She had little food in her house and still believed that her husband and son were alive. She was not aware of the petition to appoint a guardian. It was his opinion that Jenny manifested complete disorientation and had a complete inability to handle her affairs or her person. The only type of identification she could make was at least 20 years prior to the time he was talking to her.

Dr. Irving Blumenthal has been Jenny's physician since September 1966. Between 1966 and 1978 he saw Jenny 8 to 10 times a year. His initial visits with her showed that she was suffering from hardening of the arteries and from approximately 1971 on, he began to treat her basically for senility. Between 1971 and 1978, Jenny's illness grew progressively worse. On September 16, 1977, Dr. Blumenthal visited Jenny and found that she lacked the mental capacity to make decisions and, because of this, was easily influenced. The next time he saw Jenny was on June 5, 1978, in the hospital. At that time she still did not realize her husband was dead.

On cross-examination, Dr. Blumenthal admitted that he did not see Jenny between September 16, 1977, and June 5, 1978, and that prior to 1978, Jenny could understand things momentarily.

Margaret Tonkovic testified that she lived next door to Jenny, on West Fullerton. She indicated that the day following Timo's death, Jenny told her that Timo was not dead, but at work. Jenny also asked for her son, John, who has been dead for approximately six years. Tonkovic also stated that Bagnuolo had told her that Timo had been dead for about three days before Jenny informed her that a strange man was in her husband's bed. She next saw Jenny in late February or early March 1978. Jenny was locked out of her apartment, could not get in, and indicated that Timo was sleeping.

Woodfield testified that he had between 10 and 20 conversations with Timo and Jenny regarding financial matters, prior to Timo's death. He testified that Timo agreed to lend him between $75,000 and $100,000 for his business. After Timo's death, Jenny told him to discuss finances with Bagnuolo. Woodfield indicated that on several occasions he memorialized his conversations with Timo or Jenny concerning the loan and identified respondents' exhibits 1, 2, 4, 6 and 7 as copies of those letters. The court refused to allow these exhibits into evidence. He received $72,302.83 from Bagnuolo in May 1978, who had obtained the funds from a bank account she held jointly with Jenny. The loan was secured by a subordinated mortgage on his Lincolnwood, Illinois, home. He admitted that he had not made any payments toward the loan, the terms of which were $250 a month at 7% interest.

On cross, Woodfield denied receiving a letter from the public guardian requesting a return of the loan, but he later admitted that his attorney had inquired about the letter and the loan. It was his opinion that Jenny was reasonably lucid at all times.

Dr. Marvin Ziporyn, a board-qualified psychiatrist, testified on behalf of respondents. He determined that Jenny suffered from organic brain syndrome associated with arteriosclerosis. It was his opinion that she most likely had periods of remission in which she could be lucid; however, it was possible that she did not. During a period of remission she could have understood the provisions of the power of attorney. He admitted that there was nothing in his interview with her which could lead him to conclude that Jenny went through any periods of remission.

On rebuttal, Dr. Blumenthal stated that as long as he had known Jenny, she had gone through no periods of remission and that she was incompetent after 1974.

Dr. Leroy P. Levitt, a psychiatrist specializing in geriatrics, also testified on rebuttal. He indicated that the loss of a spouse in one who is suffering from arteriosclerosis can cause extreme stress and deterioration. There can be an apparent remission which can last from a few hours to a day, but if there is any remission, it usually involves non-complex matters.

The court entered an order directing respondents to pay the estate $90,027.26. This determination was based upon the drafts Bagnuolo collected from the various bank accounts of the Joutsens totalling $70,027.26, and the four redeemed $5,000-denomination United States savings bonds. These funds were all placed in accounts at the Midwest Bank under Bagnuolo's control. A notice of appeal was filed by Miles Beermann on behalf of respondents on January 11, 1980. He received a retainer of $10,000 from respondents and an additional $1,000 to represent them on appeal. On January 17, 1980, respondents had executed an affidavit filed in the appellate court in which they indicated that they had only

approximately $1,300 in cash, a home and other items of personal property. Based upon this affidavit, the guardian of Jenny Joutsen filed a supplemental citation to discover and recover assets against Miles Beermann on February 1, 1980. The court dismissed the citation for failure to state a cause of action ruling that petitioner had not made a prima facie case. Petitioner appeals from that order.

OPINION

Respondents initially contend that the court did not have the power to order them to repay the loan. They argue that the evidence shows that Woodfield borrowed the money from Jenny and then loaned it to Woodfield Industries. Thus, it is clear that neither respondent had any money belonging to the estate and the court exceeded its authority under sections 16—1 and 16—2 (Ill. Rev. Stat. 1977, ch. 110½, pars. 16—1, 16—2). Furthermore, there was no finding that either respondent converted or embezzled Jenny's funds.

■■ The objectives of a citation proceeding are to obtain the return of personal property belonging to the estate but in the possession of, or being concealed by others, or to obtain information to recover estate property. (*Lombardi v. Lepkowicz* (1975), 28 Ill. App. 3d 79, 328 N.E.2d 328.) A finding of the trial court that certain property belonged to the estate will not be disturbed on appeal unless it is against the manifest weight of the evidence, (*In re Estate of Weisberg* (1978), 62 Ill. App. 3d 578, 378 N.E.2d 1152), as the trial court in such proceedings is authorized to determine all questions of title, claims of adverse title and the right of property. *In re Estate of Denler* (1980), 80 Ill. App. 3d 1080, 400 N.E.2d 641.

In the pending matter, the trial court found that Jenny was unable to make and comprehend decisions about her person or her estate. Under these circumstances, she was incapable of understanding the power of attorney given to Bagnuolo, and, further, could not have agreed to or understood the terms of any "loan" to Woodfield. Legal documents executed during that time would necessarily be void. (See *In re Estate of DeKoekkoek* (1979), 76 Ill. App. 3d 549, 395 N.E.2d 113.) The securing of this "loan" by a mortgage on the Woodfield house neither legitimatized this transaction nor protected Jenny's interests. Moreover, the terms of the will executed on the same day as the power of attorney made Bagnuolo, who is now married to Woodfield, the sole heir of Jenny, and thus the "loan" would probably be extinguished upon Jenny's death. Respondents capitalized on Jenny's mental incapacity, and in essence, converted her funds to their own use.

■■ A fiduciary relationship was established between Bagnuolo and Jenny, and Woodfield collaborated with Bagnuolo; thus, it was respond-

ents' burden to show that the transactions complained of were fair and not the result of undue influence. (*In re Estate of Weisberg.*) There was no evidence adduced at trial which showed that any of the funds in question were used for Jenny's benefit. The weight of evidence against respondents was for the trier of fact to evaluate, and the findings must be sustained unless wholly unsupported by the evidence. (*ABC Trans National Transport, Inc. v. Aeronautics Forwarders, Inc.* (1980), 90 Ill. App. 3d 817, 413 N.E.2d 1299.) The trial court's findings were consistent with the objectives of the citation proceeding, and we cannot conclude that the court exceeded its authority under the Probate Act.

Respondents next argue that the court's finding of Jenny's incompetency is against the manifest weight of the evidence. Respondents presented a number of witnesses, all attesting to Jenny's competency during the period in question and to her ability to have lucid intervals. Their contact with her, however, did not involve complex matters and their objectivity was suspect. Her physician, who had been treating her regularly since 1966, testified that she had been suffering from senility since 1971 and it was irreversible. He did not notice any remission of her symptoms and, in fact, she grew progressively worse. His observations were corroborated by some of Jenny's neighbors and her guardian. Moreover, respondents' expert witness concluded that Jenny was incompetent, and it was possible that during the period in question she did not have lucid periods.

■■ Jenny's competency must be determined by her ability to transact ordinary business, to understand the nature of the business in which she is engaged and the effect of what she is doing. (See *Freiders v. Dayton* (1978), 61 Ill. App. 3d 873, 378 N.E.2d 1191.) The trial court determined that Jenny did not have the capacity to perform and understand business, to either manage her person or her estate at the time in question and subsequently, and we believe the record more than adequately supports this determination.

Finally, respondents argue that the trial court's finding that they obtained $90,027.26 from petitioner's estate is not supported by the evidence, as the record only shows that Woodfield borrowed $72,302.83 from Jenny. We disagree.

The trial court based its finding on the unaccounted-for monies funneled from the Joutsens' accounts and redeemed savings bonds into the accounts under respondents' control. The record reveals that the court's finding is not against the manifest weight of the evidence to be subject to reversal on appeal. *In re Estate of Denler.*

Petitioner appeals the trial court's dismissal of the supplemental citation to discover and recover assets against respondents' attorney. Petitioner has asserted that the payment to Beermann constituted a transfer of assets of the estate, as respondents' affidavit indicated they only had

approximately $7,300 in assets. Beermann received approximately $11,000 as a retainer after the judgment was entered against respondents.

 Petitioner must establish that property belonging to the estate was transferred to a third party in order to prevail on a supplemental petition. (See *In re Estate of Garrett* (1967), 81 Ill. App. 2d 141, 224 N.E.2d 654.) The monies used to retain Beermann could have been obtained from a number of other sources outside of respondents' personal assets, *e.g.*, borrowed from relatives. As such, we must agree with the trial court that petitioner failed to establish a prima facie case and affirm the dismissal of the supplemental petition.

For the foregoing reasons, we affirm the orders of the trial court insofar as they are applicable to both respondents and petitioner.

Affirmed.

LORENZ and MEJDA, JJ., concur.