*In re* ESTATE OF RICHARD D. DIVINE, Deceased (Alice Lyster, Sr., *et al.*, Petitioners-Appellants, v. Patricia Giancola, Respondent-Appellee).

First District (6th Division)   No. 1—92—3636

Opinion filed May 6, 1994.

Ronald H. Balson, of Chicago, for appellants.

A. Charles Kogut and Anthony J. Kogut, both of Kogut & Associates, of Des Plaines, for appellee.

PRESIDING JUSTICE EGAN delivered the opinion of the court:

The petitioners, who are family members and legatees of the deceased, Richard Divine (Richard), filed a petition for a citation of recovery against Patricia Giancola, alleging that Giancola wrongly obtained possession of money which was properly part of Richard's

estate. Giancola claimed the funds as the surviving joint tenant of two joint bank accounts. After a hearing, the trial judge granted Giancola's motion to dismiss the petition. He held that Giancola was not a fiduciary to Richard as a matter of law and that the petitioners had failed to maintain their burden of proving undue influence over Richard on the part of Giancola. The petitioners maintain that Giancola was a fiduciary to Richard as a matter of law and that it was her burden to prove that the funds she received from Richard were not the result of a breach of a fiduciary obligation or of undue influence.

Beginning in approximately 1979, Giancola was employed in Chicago by attorney Samuel Poznanovich as a part-time secretary in his law office. Eventually, she became his full-time secretary. Giancola received a paralegal certificate from Roosevelt University in 1980, and took an H&R Block tax course in 1970. Poznanovich employed one other secretary in addition to Giancola.

In 1981, Richard and his wife, Lila, came to Poznanovich's office for income tax services. The Divines did not have any children and both were retired. Giancola estimated that they were in their "early seventies" in 1981. Giancola interviewed the Divines, took tax information from them such as W-2 forms and copies of their previous tax returns, and introduced them to Poznanovich. After this initial meeting, Poznanovich prepared the Divines' tax returns every year until 1986. Each year, Giancola would interview the Divines and gather their tax information. She never prepared their taxes, but simply gathered information for Poznanovich's use. In 1985, Poznanovich also represented Richard in a personal injury case. Giancola was not involved in that case. Additionally, Richard called Poznanovich occasionally for legal advice on other matters. Before 1986, Giancola and Poznanovich saw the Divines only at the law office, although, according to Poznanovich, the relationship became "more and more friendly" each year.

In December 1986, Lila died. Richard called Giancola at the office to tell her about Lila's death. Giancola stated that Richard had "depended on Lila for just about everything" and was very lonely without Lila. Also, he was "unable to do for himself." Giancola went to visit Richard in his apartment on Coles Avenue "within a day or two" of Lila's death. Richard was afraid to leave the apartment alone and could not walk long distances because "his legs were bad." Richard's relatives and Poznanovich also testified that Richard had physical problems with his legs. Giancola stated that for "the most part," Richard was confined to his apartment. After Giancola's first visit, Richard frequently called her and she visited his apartment once or

twice a week. Richard asked her to assist him in getting his groceries and other necessities. Richard gave Giancola money for the groceries and supplies. She testified that he did not give her a "fee" for her services, but admitted that sometimes he gave her "something for [her]self." He did his own cooking while living in the Coles Avenue apartment.

Giancola believed that the neighborhood around Coles Avenue was too dangerous for Richard, and she did not like going there to visit him. She suggested that he move to a safer area; she also mentioned to Poznanovich that Richard's neighborhood was unsafe. Poznanovich's office is located in a building he and his sister own. There are four residential apartments in that building which are rented by Poznanovich and his sister. Giancola occasionally takes the rent checks from tenants for Poznanovich. When an apartment became vacant in Poznanovich's building, Giancola told Richard it "would be easier" if he moved into that apartment. She did not know that Richard's relatives wanted him to move to Michigan City, Indiana.

Many of Richard's relatives, including Richard's sister, Alice Lyster (Alice), one of the petitioners, live in Michigan City, Indiana. Richard and Lila usually visited their relatives in Michigan City twice a year. Several family members testified that their relationship with Richard was good and that there was no "feuding" in the family. Before the apartment in Poznanovich's building became vacant, Poznanovich called Alice and asked her if Richard could live in Michigan City. According to Poznanovich, Richard wanted to live with his sister in her house. Richard's relatives invited Poznanovich and Richard to Indiana. Poznanovich and Richard believed that they were visiting Michigan City to arrange for Richard to move into Alice's house.

One of Richard's nephews by marriage, Dennis Blumenfeld, and another nephew, Ted Lyster (Ted), a petitioner, testified that in early 1987 they located an apartment in Michigan City approximately one mile from Alice's house. Blumenfeld is married to Susan Blumenfeld, another niece and another petitioner. Ted and Blumenfeld paid a deposit to hold the apartment for Richard. In June 1987, Poznanovich drove Richard to Michigan City to view this apartment. Poznanovich explained that Richard did not enter the apartment, but stood outside and said that it was a nice, clean apartment and he "would let the family know" if he wanted to move there. Ted testified that the apartment "seemed to be agreeable" to Richard.

After viewing the apartment, Ted, Richard and Poznanovich went to Alice's house. Poznanovich testified that Richard asked to live

with Alice, but Alice told him he could not live with her because "she had her own social obligations; she had bingo [and other activities]." Alice did not testify. Ted did not remember whether Richard asked to live with Alice. As far as Ted knew, Alice never offered Richard the option of living in her house. During the drive back to Chicago, Richard told Poznanovich that if he could not live with his sister, he did not want to move from Chicago.

Approximately two weeks after they visited Michigan City, the apartment opened in Poznanovich's building. Richard then told Poznanovich that he wanted to live in Poznanovich's building. Richard moved into the building in June or July 1987. Giancola and Poznanovich helped him move. He paid rent of $300 per month to Poznanovich, sometimes giving Giancola his rent check. Richard did not socialize with other people and usually did not leave the apartment. Poznanovich testified that in 1987 Richard was not capable of living alone in an apartment without some assistance, although he did his own cleaning. According to Poznanovich, Richard "needed [to be] taken care of." Giancola continued to buy his groceries and supplies, apparently during weekday working hours. She testified that Richard continued to give her money for the groceries and to occasionally give her "something for [her]self." Poznanovich testified that in 1987 Richard trusted Giancola and "she took care of him." Giancola considered herself Richard's friend.

Sometime after Richard moved, Poznanovich shut off the gas to his stove, although the rent included all utilities. Giancola could not remember exactly when the gas was stopped, and Poznanovich was not asked when he turned off the stove. Poznanovich testified that Richard had forgotten a pan on the stove and started a small fire. Therefore, he believed it was dangerous for Richard to have a working stove. Giancola explained that Richard "let a pan burn." When asked if Richard was "getting forgetful" at the time the stove was turned off, Giancola testified that she "guessed so." After the stove was disconnected, Giancola began cooking Richard's meals and bringing him hot food. Without the stove, "it was impossible" for Richard to cook his own food.

There was additional testimony about Richard's physical and mental condition at the hearing. Giancola explained that Richard's vision was deteriorating while she knew him but that he still could read his checks and bills. Blumenfeld testified that Richard could not see well even while Lila was alive. However, Ted testified that Richard could see "fairly well." Regarding Richard's mental health, Giancola admitted that "a time or two" when Richard lived in Poznanovich's building, Richard wandered out of the building and

was brought home by the police. Neither Poznanovich nor Giancola testified as to when these events occurred. Blumenfeld stated that, at Lila's funeral, Richard was depressed, thin, and "disheveled"; it was obvious Richard "had a problem." This appearance was not consistent with Richard's usual dress.

In June 1990, Poznanovich petitioned the court to be appointed Richard's guardian, alleging that at that time Richard was "suffering from organic brain syndrome and dementia [and was] mentally disoriented most of the time." The order appointing Poznanovich guardian for a disabled person is in the record, but the petition itself is not. The petitioners do not make any claim in this court that Poznanovich's petition was improper. We must assume, therefore, that notice of the petition was properly served on interested parties and that no one objected to the petition.

In addition to getting his supplies and cooking his meals, Giancola cashed checks for Richard and made bank deposits for him. She wrote out the checks for all his bills. She explained that she would write the checks, he would sign them, and she would mail them. All these transactions involved only Richard's personal checking account. Richard would discuss "personal problems" with Giancola, but did not talk to her about legal matters.

Blumenfeld testified that he visited Richard and Lila three times while they were living on Coles Avenue. They lived "very frugally." Richard was afraid to leave the Coles Avenue apartment and would stand at the window and watch Lila walk to the grocery store. After Richard moved into Poznanovich's building, Blumenfeld visited him weekly. Blumenfeld met Giancola during one of his visits and testified that Giancola and Poznanovich saw him visit every week. Poznanovich testified that "whenever [Blumenfeld] would visit Richard, he would stop by in the office and chat a bit." Blumenfeld said he missed his weekly visit only once. Giancola stated that Blumenfeld's visits were very rare. He did not visit weekly. She admitted that she was not at the apartment on weekends, however, and that she therefore did not see Richard's weekend visitors.

Blumenfeld stated that he "brought [Richard] his food"; he went to the grocery store every week to purchase food and other items for Richard. At first, Blumenfeld paid for these items with his own funds, because he believed Richard needed financial assistance, but later Richard gave him money for the groceries. Blumenfeld occasionally heard Richard call Giancola for this grocery money and knew that Giancola kept Richard's checkbook. Richard "got his money from [Giancola]." Blumenfeld said there was never much food in Richard's apartment, and the only food he saw was from "a bar next door, they

brought him his lunch." In contrast, Giancola testified that "[o]cca-sionally, very, very rarely upon [Blumenfeld's] rare visits, [he] would bring a bag of potato chips or Cheetos, cookies and sweet things like that." These snacks were the only food items in the apartment which Giancola did not purchase. Blumenfeld testified that he cleaned and did small repairs in Richard's apartment and purchased new clothes and furniture for Richard.

Blumenfeld did not assist Richard with his finances. During one visit, after November 1987, Blumenfeld took some bank account statements he saw Richard putting in the garbage. According to Poznanovich, this took place in the summer of 1988. Poznanovich testified that Richard told him Blumenfeld "was snooping around [his apartment] and took some papers." Blumenfeld denied that Richard called him "snoopy." Blumenfeld testified that he looked only at the balances on the statements. However, he determined that one was a non-interest-bearing account with "substantial" funds. Blumenfeld told Richard that he should close the account and buy certificates of deposit in order to obtain interest. Blumenfeld admitted calling a bank manager and asking about the accounts. He denied telling the manager that he was a lawyer or asking whose names were on the accounts or what amounts were in them. Blumenfeld admitted that he asked the bank manager about certificate of deposit interest rates and that he told Poznanovich that Richard's accounts should be made interest-bearing.

Ted also testified about visiting Richard in his apartment in Poznanovich's building. He stated that he either brought Richard lunch or took him out to lunch in Chicago when he visited. Richard never discussed "giving his money away."

In November 1987, Richard called Poznanovich and asked him to come to his apartment. In the apartment, Richard told Poznanovich that he wanted to "put his affairs in order." First, he handed two bank account passbooks to Poznanovich and said "I want this for my sweetheart." Richard told Poznanovich that his "sweetheart" was Giancola, and that he wanted her to have the two accounts. These two accounts were separate from Richard's personal checking account which Giancola used for his finances. Richard told Poznanovich he did not want to leave the accounts to Giancola in his will because he wanted her "to have them now." Richard explained: "As far as I'm concerned, if it were not for her, I would be dead now." Poznanovich suggested that the accounts be made joint accounts, like the accounts Richard had shared with Lila. When Poznanovich assured Richard that a joint tenancy would allow Giancola to have the money immediately, Richard told Poznanovich to change the two accounts

to joint accounts. Giancola was not present during this discussion. Poznanovich testified that he did not receive any direct or indirect financial benefit from this transaction.

Next, Richard asked Poznanovich to draft a will for him. The will made Poznanovich executor of the estate and gave $3,000 each to Giancola and Poznanovich. Poznanovich testified: "I had a problem with [Richard] inserting me as a beneficiary under the will, *** [and] we agreed that if I were to remain in the will as a beneficiary, I would waive my executor's fee, which I did." The will made one other specific bequest of $2,000, then left one half of the residuary estate to the petitioners and one half to four other family members. After his death, the value of Richard's estate, in addition to the joint accounts, was approximately $150,000.

Poznanovich obtained two signature cards from the bank and had the accounts changed to joint accounts. On November 14, 1987, he asked Giancola to sign these signature cards. Neither Richard nor Poznanovich ever discussed the accounts with Giancola before presenting her with the cards. They also did not discuss the transactions with any members of Richard's family. Poznanovich testified that Giancola was not "in any way aware of the fact" that Richard was giving her joint tenancy of the accounts before November 14. Giancola understood that she was becoming a joint tenant with Richard when she signed the cards on November 14. Immediately after signing the cards, she discussed them with Richard. She did not discuss the joint accounts with any members of his family. She asked Richard if he understood what the cards "meant" and he told her that he understood. Based on her conversation with Richard, Giancola was certain that he knew the nature of a joint tenancy. He never told her the accounts were made joint accounts for his convenience or to make it easier for her to pay his bills. Giancola did not make deposits of either her own money or Richard's money into these accounts, and did not withdraw any money from the accounts until after Richard's death.

On June 19, 1990, Giancola found Richard "semi-conscious" in his apartment. She called an ambulance, and Richard was hospitalized. After approximately one week in the hospital, Giancola "had [Richard] transferred to a nursing home." In August 1990, Richard died at the nursing home. Poznanovich was then appointed executor of Richard's estate. After Richard's death, Giancola withdrew all the money from the joint accounts. The petitioners allege that Giancola received $165,958.60 from these accounts.

The petitioners filed a petition for a citation to recover assets against Giancola. The original petition is not in the record, but an

amended petition refers only to recovery from Giancola, and requests only the return of the $165,958.60. There is no allegation that Poznanovich improperly received estate funds. Further, the petition does not mention the $3,000 will bequests to Giancola and Poznanovich, and does not allege that Poznanovich should be ordered to return money to the estate. It asserts that Giancola was a fiduciary to Richard, that she obtained the $165,958.60 through "undue influence and fraud," and that Richard "lacked the mental capacity to understand the consequences of his actions."

At the hearing, the petitioners urged the judge to place the burden of proving the transaction was proper on Giancola. They supported this argument with their contention that Giancola and Poznanovich, as legal professionals, owed Richard a fiduciary duty as a matter of law. The judge repeatedly stated that Poznanovich's actions were not relevant to the question of Giancola's liability to the estate, and placed the burden of proving that the transaction was improper on the petitioners. He then explained: "I don't see from the evidence a legal fiduciary relationship between Giancola and [Richard.]" Also, he explicitly found that Giancola did not exert any undue influence on Richard, especially at the time the accounts were made joint. Finally, he explained that "[t]here [was not] any testimony here, medically that he was incompetent at the time this transaction took place." For these reasons, he denied the petition.

At the hearing in the trial court and in this court the petitioners argued that the actions of Poznanovich and Giancola are inextricably intertwined and that because Giancola was a paralegal and an employee of the lawyer, Poznanovich, who was a fiduciary as a matter of law, so also is Giancola a fiduciary as a matter of law. They also repeatedly assert that Poznanovich gained financially from the transactions which benefitted Giancola. Nonetheless, they never requested that Poznanovich or Giancola return the $3,000 bequests and they do not challenge the validity of the will. Additionally, they have never made Poznanovich a party to these proceedings. Essentially, the petitioners argue that Poznanovich's questionable action of drafting a will which gave him a gift and his status as an attorney should be imputed to Giancola and that she should be liable because of his actions.

Under certain circumstances, one person will be charged with liability for the actions of or knowledge given to another person. For example, actions by one partner will be imputed to another partner. (*Couri v. Couri* (1983), 95 Ill. 2d 91, 447 N.E.2d 334.) Also, an employer will be held liable for certain actions of his employee. (*Towns v. Yellow Cab Co.* (1978), 73 Ill. 2d 113, 382 N.E.2d 1217.) There is no

case law holding an employee liable for the acts of his employer, however, and the petitioners cite no law to support their position that Giancola should be accountable for Poznanovich's actions. Unfortunately, there also is no case law in Illinois involving the narrower question of a paralegal's fiduciary duty to his employer's client, making this a case of first impression. In fact, we have found no reported case in the United States involving a paralegal's fiduciary responsibility, as a paralegal, to his attorney's client.

Moreover, there is very little case law from Illinois or any jurisdiction generally discussing paralegals. Two cases address the somewhat analogous issue of a paralegal's possible liability for legal malpractice. A divided Nevada Supreme Court, in *Busch v. Flangas* (1992), 108 Nev. 821, 837 P.2d 438, held that an attorney's law clerk or paralegal who attempts to provide legal services can be liable for malpractice to the client. On the other hand, the *Busch* dissent argued that a law clerk or paralegal, as an employee of an attorney, owes no duty to the attorney's client, but is liable only to the attorney. (*Busch*, 108 Nev. at 824, 837 P.2d at 440 (Springer, J., dissenting).) The court of appeals of Ohio, without extensive discussion, determined that a paralegal could not be sued for legal malpractice because she was not an attorney. *Palmer v. Westmeyer* (1988), 48 Ohio App. 3d 296, 303, 549 N.E.2d 1202, 1209.

On the other hand, the idea that an attorney is liable, in malpractice or as an ethical violation, for his paralegal's acts is well supported in Illinois. Rule 5.3 of the Supreme Court Rules of Professional Conduct places the responsibility for unethical acts by nonlawyer employees on the employing attorney. (134 Ill. 2d R. 5.3; see also S. Stevenson, *Using Paralegals in the Practice of Law*, 62 Ill. B.J. 432 (1974).) Similarly, in *Glover Bottled Gas Corp. v. Circle M. Beverage Barn, Inc.* (1987), 129 A.D. 2d 678, 679, 514 N.Y.S.2d 440, 441, a New York court held that paralegals are not governed by the Code of Professional Responsibility (Code), but that their employing attorneys are in violation of the Code when they fail to supervise the paralegals properly. The supreme court of New Jersey echoed this idea when it held that paralegals who are properly supervised by attorneys are not liable for the unauthorized practice of law. (*In re Opinion Number 24* (1992), 128 N.J. 114, 123, 607 A.2d 962, 966.) The New Jersey court noted that any supervising attorney who does not properly supervise the paralegals working for him is in violation of the Code of Professional Responsibility. (*Opinion Number 24*, 128 N.J. at 127, 607 A.2d at 969.) Finally, in Michigan, paralegals are generally treated as extensions of their supervising attorneys for ethical and malpractice purposes. V. Voisin, *Ethical Standards for*

*Legal Assistants*, 70 Mich. B.J. 1178 (1991); see generally Symposium, *Legal Assistants in Michigan*, 70 Mich. B.J. 1147 (1991).

Several Illinois cases support the idea that paralegals are an extension of their employing attorney. For example, the presence of an attorney's employee, such as a secretary or law clerk, does not destroy the attorney-client privilege for material disclosed to the attorney in the employee's presence. (*In re Estate of Busse* (1947), 332 Ill. App. 258, 75 N.E.2d 36; M. Graham, Cleary & Graham's Handbook of Illinois Evidence § 505.5, at 274-75 (5th ed. 1990); see, *e.g.*, *Samaritan Foundation v. Superior Court* (Ariz. Ct. App. 1992), 173 Ariz. 426, 844 P.2d 593, *vacated in part on other grounds* (1994), 176 Ariz. 497, 862 P.2d 870. (specifically holding that the presence of a paralegal does not destroy the privilege).) Also, in the majority of Illinois cases discussing paralegals, which involve disputed attorney fee petitions, the courts have held that an attorney may recover reasonable fees for time properly spent by his paralegal. (See, *e.g.*, *In re Petition for Fees* (1983), 117 Ill. App. 3d 744, 747, 453 N.E.2d 949.) Several fees cases stress, however, that compensable time must be spent "under the direction and control of a licensed attorney." See *In re Marriage of Ahmad* (1990), 198 Ill. App. 3d 15, 23, 555 N.E.2d 439.

■ Based on these cases, we refuse to treat Poznanovich and Giancola as a unit for purposes of Giancola's liability. It is clear that Poznanovich, as a licensed attorney and as an employer, could be held liable for Giancola's actions. Nonetheless, holding Giancola liable as if she were an attorney is not consistent with general *respondeat superior* law or with the decisions discussed above treating paralegals as subordinate employees of attorneys. The theme running through all these cases is that paralegals do not independently practice law, but simply serve as assistants to lawyers. They are not equal or autonomous partners. Thus, while supervisors properly are held liable for paralegals' actions, the subordinate paralegals should not be liable for the actions of these supervisors. Therefore, we refuse to find that Giancola owed Richard a fiduciary duty simply because she worked for Richard's attorney, and we refuse to hold that paralegals are fiduciaries to their employers' clients as a matter of law.

We wish to make our position clear that the trial court and this court must take the case as it has been presented to us. Contrary to the petitioners' statement in oral argument before us, the petitioners did not argue in the trial court that the evidence established a fiduciary relationship between Giancola and Richard even in the absence of her role as a paralegal and employee of Poznanovich. Indeed, in the trial court the petitioners' attorney argued that the personal re-

lationship between Richard and Poznanovich and Richard and Giancola did not "make[] any difference." Even in this court, the petitioners' entire argument that a fiduciary relationship existed between Richard and Giancola, regardless of her position in Poznanovich's office, consists of a single sentence in a 22-page brief. They cite no case and make no attempt to analyze the evidence to show the existence of a fiduciary relationship absent Giancola's relationship with Poznanovich. It is an elementary rule of appellate practice that an appellant may not make a point merely by stating it without presenting arguments in support of it. This court will not research and argue a case for an appellant. (*Nicholl v. Scaletta* (1982), 104 Ill. App. 3d 642, 432 N.E.2d 1267.) Because the issue was not presented in the trial court and has not been properly presented in this court, we will not consider it.

■ Because Giancola was not a fiduciary, the burden of proof applicable in this case is governed by *Murgic v. Granite City Trust & Savings Bank* (1964), 31 Ill. 2d 587, 202 N.E.2d 470. In *Murgic*, the supreme court recognized that the recently enacted statute governing joint tenancy accounts raised questions about the applicable burdens of proof and production regarding any challenged joint tenancy. (31 Ill. 2d at 590.) The statute at issue in *Murgic* created new guidelines for written joint tenancy accounts which went beyond the requirements of the common law. The *Murgic* court explained that it was discussing the effect of the statute's suggested contract for joint tenancy on the need for evidence of donative intent, such as evidence of transfer of possession. (31 Ill. 2d at 589-90.) The court stated that it wanted to "add certainty to the law" and held:

> "[A]n instrument creating a joint account under the statutes presumably speaks the whole truth; and, in order to go behind the terms of the agreement, the one claiming adversely thereto has the burden of establishing by clear and convincing evidence that a gift was not intended. This burden does not shift to the party claiming under the [joint tenancy] agreement." (31 Ill. 2d at 591.)

*Murgic* did not involve a joint tenancy between fiduciaries or any other presumption regarding transfer validity. 31 Ill. 2d at 589-90.[1]

■ We believe that the trial court, by following *Murgic*, properly

---

[1]Whether the holding of *Murgic* is applicable when a fiduciary relationship is involved is debatable. (Compare *In re Estate of Foster* (1969), 104 Ill. App. 2d 447, 244 N.E.2d 620, and *In re Estate of Copp* (1971), 132 Ill. App. 2d 974, 271 N.E.2d 1, with *In re Estate of Trampenau* (1980), 88 Ill. App. 3d 690, 410 N.E.2d 918.) But because we agree that the petitioners have not established a fiduciary relationship, our observation on the conflict between the opinions is informational only.

held that the burden of proving the impropriety of the transaction by which Giancola was made a joint tenant was upon the petitioners. Under *Murgic*, therefore, the presumption exists that Richard intended to make a gift to Giancola. The burden of overcoming the presumption, by clear and convincing evidence, "is upon one questioning the gift." (*In re Estate of Lewis* (1990), 193 Ill. App. 3d 316, 319, 549 N.E.2d 960.) The petitioners assert that they met this burden by showing that Giancola received a separate bequest under the will and did not use any of the joint account funds until after Richard's death. They rely on *In re Estate of Friedman* (1984), 123 Ill. App. 3d 82, 462 N.E.2d 692, to support this argument. The petitioners place particular emphasis on one aspect of *Friedman*. They stress the *Friedman* court's statement that a relevant factor in determining donative intent regarding joint bank accounts is the "exercise of authority and control over the joint account." (123 Ill. App. 3d at 85.) In *Friedman*, the woman who established the joint accounts kept the account passbooks in her personal lock box and gave the other joint tenant very limited access to the account. Further, the money from the accounts was used only for the woman's bills and personal needs, and the accounts were established only after the woman had been hospitalized for an extended period of time. The *Friedman* court upheld the trial judge's determination that the creation of the joint accounts was for the woman's convenience only, and was not meant as a gift to the other joint tenant. 123 Ill. App. 3d at 88.

We find *Friedman* distinguishable from the facts in this case, and emphasize that *Friedman* was an affirmance of the trial judge's factual determination. It is true that Giancola, like the *Friedman* joint tenant, did not exercise control of the accounts during Richard's life. Nonetheless, the petitioners presented no testimony that Richard retained control of the accounts and allowed Giancola only limited access to them. Significantly, Poznanovich testified that Richard explicitly stated that he wanted Giancola to have access to the money immediately. In contrast to the woman in *Friedman*, Richard asked Giancola to pay his bills by checks only from his personal checking account and never gave her directions to remove money from the joint accounts for his needs. He did not establish the accounts after a recent period of inability to care for himself, but after Giancola had been paying his bills and doing his shopping for quite some time.

Further, Giancola and Poznanovich both discussed the nature of joint accounts with Richard, who had had joint accounts with his wife before her death. There was no testimony indicating that Richard was not able to understand the nature of the accounts. In fact, the only testimony about his alleged forgetfulness did not

specifically involve November 1977, when he created the joint accounts, and thus could not rebut the assumption of donative intent. (See *In re Estate of Joutsen* (1981), 100 Ill. App. 3d 376, 426 N.E.2d 942; *In re Estate of Basich* (1979), 79 Ill. App. 3d 997, 398 N.E.2d 1182.) Also, there was evidence that Richard felt rejected by his family after the trip to Michigan City and that he believed he owed his life to Giancola. Much of the evidence presented by the petitioners was from Blumenfeld, who was contradicted by both Giancola and Poznanovich. The trial judge was free to believe Poznanovich and Giancola. In light of the evidence, the trial judge's finding that the petitioners did not overcome the presumption Richard gave Giancola a gift was not against the manifest of the evidence.

The trial judge correctly found that there was no evidence Giancola participated in the transfer of the funds from Richard's private accounts into the joint accounts. The petitioners have presented no evidence that Giancola was present when Richard and Poznanovich established the joint accounts or that she knew about the transfer before it occurred. They do not even argue that Giancola somehow participated in the transfer.

We also agree with the judge's determination that there was no showing that Richard was incompetent at the time the transfer was made and there was no showing of undue influence on the part of Giancola that caused Richard to make the transfer.

We also wish to make it clear that we are not saying that the evidence shows that Poznanovich did anything improper. We have discussed his "actions" only in the general sense to illustrate that, while he was a fiduciary to Richard as a matter of law and if he had been the recipient of the joint account funds, the burden of proof would have been on him to show that the transaction was proper, his fiduciary obligations may not be imposed upon Giancola. Nor are we saying that an improper transfer may never be shown under circumstances like those present in this case. If the petitioners had offered evidence from which it could be inferred that collusion existed between Poznanovich and Giancola or that Poznanovich gained financially in any way from the transfer, our holding would be different. But neither the trial judge nor this court may decide a case on speculation, guess, conjecture or suspicion.

For these reasons, the judgment of the circuit court is affirmed.

Judgment affirmed.

McNAMARA and RAKOWSKI, JJ., concur.